UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MANUEL A. PONCE,

      Plaintiff,

v.                         Case No:  2:17-cv-137-FtM-99CM

CITY OF NAPLES,

      Defendant.

_____

**OPINION AND ORDER**

This matter comes before the Court on defendant's Motion for
Summary Judgment (Doc. #39) and supporting documentation filed on
December 18, 2017.  Plaintiff filed a Response in Opposition (Doc.
#44) and supporting documentation on January 29, 2018.  A Reply
(Doc. #48) and Sur-reply (Doc. #22) were filed.  For the reasons
set forth below, the Motion is denied.

**I.**

A court may grant summary judgment only if satisfied that
"there is no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law."  Fed.
R. Civ. P. 56(a).  A fact is "material" if it goes to "a legal
element of the claim under the applicable substantive law" and
thus may impact the case's outcome.  Allen v. Tyson Foods, Inc.,
121 F.3d 642, 646 (11th Cir. 1997).  "An issue of fact is 'genuine'
if the record taken as a whole could lead a rational trier of fact

to find for the nonmoving party." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004).

"The burden of establishing that there is no genuine issue of material fact lies with the moving party." Walker v. Darby, 911 F.2d 1573, 1576 (11th Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). "[O]nce the moving party has met that burden by presenting evidence which, if uncontradicted, would entitle it to a directed verdict at trial," the party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial. A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Id. at 1576–77. In ruling on the motion, the court must view all evidence and draw all reasonable inferences in favor of the non-moving party. Scott v. Harris, 550 U.S. 372, 380 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010).

Summary judgment should be denied not just where the parties disagree on issues of material fact, but also "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts." Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir. 1983); see also Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007) ("If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference

introduces a genuine issue of material fact, then the court should not grant summary judgment."). Put simply, if the resolution of a material fact or the inference to be drawn therefrom presents a "he said, she said" scenario, and if the record has evidence genuinely supporting both sides of the story, then summary judgment is not appropriate.

## II.

This case alleges unlawful retaliation and discrimination in violation of the Florida Civil Rights Act (FCRA), the federal Family and Medical Leave Act (FMLA), and the Americans with Disabilities Act (ADA) against the City of Naples (defendant or City), which is plaintiff Manuel A. Ponce's (plaintiff or Ponce) former employer. (Doc. #22.)[1] Plaintiff seeks injunctive relief, back pay, front pay, reimbursement for lost expenses, declaratory relief, compensatory damages, and his attorney's fees and costs. (Id.)

The undisputed material facts are as follows: Ponce, a Hispanic male, started working at the City in the Solid Waste Division of the Utilities Department (the "Division") as a Service Worker II in 1988, and worked there for the next 27 years until he involuntarily resigned in 2016. (Doc. #44-1, 5:4-5.) Throughout

---

[1] The Court previously dismissed Counts 1, 4, 8, and 11. (Doc. #30.) Plaintiff withdrew Counts 5, 6, and 12. (Doc. #26, p. 2; Doc. #44, n.19.) Therefore, only Counts 2, 3, 7, 9, and 10 remain.

his employment, Ponce held various job classifications as Service Worker III, Equipment Operator III, Meter Reader, and Equipment Operator V.  From about 2009, until his resignation in 2016, plaintiff worked as a front load driver, emptying commercial dumpsters throughout the City as Heavy Equipment Operator V. (Id., pp. 8-9.)

During the relevant time period, Ponce's immediate supervisor was William Wilcox.  The Superintendent of the Solid Waste Division, Brad White, was above Wilcox.  Ponce had a good relationship with White and on days when Wilcox was out of the office, White would put Ponce in charge and White had hopes that Ponce would progress to a supervisor position.  (Doc. #39-1, 8:1-8, 9:11-19.)  White died in 2015 and was replaced by Denny Kotala, although Ponce had also applied for the position.  Bob Middleton, the Director of the City's Utilities Department, which encompasses solid waste, was above Kotala.  Prior to his death, White sent a memo to Middleton dated January 22, 2015, recommending reclassification of Ponce's job to Solid Waste Coordinator to include advanced duties and responsibilities, as well as a higher salary.  (Doc. #44-6.)  In doing so, White praised Ponce's work performance.  (Id.)

## A. Timeline of Plaintiff's Performance

The parties have submitted Ponce's performance evaluations from 1988-2016.  (Doc. #39-1, pp. 72-74; Doc. #44-1.)  Throughout

the years, Ponce generally performed as "expected" or "competent," but he did receive some unsatisfactory ratings and at times was disciplined and reprimanded.  See, e.g., Doc. #44-1, p. 9, 2010-11, written reprimand for windshield damage and not servicing a container/neglect of duty; p. 13, 2008-09, written reprimand for not using personal eye protection, needs to improve compliance with safety procedures and written reprimand for mailbox damage; p. 22, 2005, involved in a preventable accident; Doc. #44-3, p. 3, 2000-01, involved in an accident.  Although he was reprimanded, Ponce's total overall ratings remained "expected" on every evaluation until 2015.

### 1. Plaintiff's Health Problems Begin

In October 2013, Ponce suffered a heart attack and remained out of work for approximately one month.  Upon his return, he started driving a smaller dumpster carrier truck.  On March 1, 2015, Ponce was admitted to the hospital with chest pains, but was released two days later and returned to work without restrictions. (Doc. #39-5, 15:9-24; Doc. #44-8.)

In April 2015, Wilcox assigned Ponce to residential garbage collection to cover for a coworker, which entailed manually picking up garbage containers and emptying them into collection bins. While climbing into the truck, Ponce strained his shoulder, re-aggravating a rotator cuff injury.  (Doc. #44-9.)  Following treatment, in May 2015 his physician returned him to work on light

duty with restrictions of lifting no greater than 20 pounds and no overhead work, as well as physical therapy three times a week for four weeks. (Id.; Doc. #44-10.) The restrictions were later adjusted to no lifting, carrying, pushing, or pulling greater than 10 and then 15 pounds with his right arm. (Doc. #44-10, p. 4.)

When Ponce returned to work on light duty, the City did not assign him to drive a dumpster carrier truck. Instead, the City assigned him to various jobs, including picking weeds, trimming hedges, and emptying rattraps, tasks all solid waste employees are required to do. (Doc. #39-1, 19:10-15; Doc. #39-4, 23:2-5.) In July 2015, while pulling weeds and trimming hedges outside, Ponce suffered two heat strokes, a week apart from each other. After this, Kotala began having concerns about Ponce's performance, believing that Ponce was unable to perform the simplest of assignments. (Doc. #39-3, 24:6-17.) Yet other than trimming bushes, Kotala could not recall what other simple assignments Ponce was unable to perform. (Id., 24:18-22.) Kotala relayed his concerns to Middleton. (Id., 24:9-13.)

On July 21, 2015, the City's workers compensation carrier denied Ponce's claim for his shoulder injury on the basis that the injury was not work-related, but was the result of a personal, preexisting medical condition. (Doc. #39-7, 51:23-52:2.) As a result, on July 28, 2015, the City advised Ponce that it could no longer accommodate his right shoulder light work restrictions.

(Id., 50:10-61:9.)   Therefore, effective immediately, the City took Ponce out of work and placed him on personal leave and provided him with FMLA paperwork.   (Id., 66:20-67:3.)   The City advised Ponce that he could not return to work until he had been released to full duty with no work restrictions.   (Id., 68:21-25.)

### 2. Negative Annual Performance Evaluation Immediately Following FMLA Leave

Ponce subsequently went on FMLA leave, had shoulder surgery in August 2015 (Doc. #44-15), and did not return to work until on or about December 28, 2015[2] after his doctor had determined he was able to return to his job as a Heavy Equipment Operator with no restrictions.  (Doc. #44-33, Fitness for Duty Evaluation).  During his absence, Ponce's annual evaluation for fiscal year October 1, 2014 to September 30, 2015 came due.  Although Ponce was on light duty work restriction from May to August 2015, and absent from August to December 2015, any performance during that time period was evaluated, including the time on light duty.  (Doc. #39-4, 28:5-13; Doc. #39-2, 94:19-95:1.)  Wilcox prepared the evaluation and it was a poor one.  Out of sixteen performance factors, Ponce ranked "unsatisfactory" in eleven and "expected" in the rest. (Doc. #39-1.)   The total overall rating was "unsatisfactory." (Id.)   This was the first time Ponce's total overall rating was

---

[2] There is discrepancy in the record as to the exact date Ponce returned to work, but it is undisputed it was late December 2015.

unsatisfactory in the 26 years he had been employed by the City. His evaluation stated:

> Manuel needs to improve job performance. His dumpster repair skills need to improve so he can perform sufficient work that will last. He needs to improve initiating work on his own and be more efficient with the time he takes to complete assignments and do so with minimal supervision.

(Id., p. 2.) At his deposition, Wilcox was unable to provide any specific examples of things Ponce did or failed to do that would lead to an overall unsatisfactory rating.[3] (Doc. #39-2, 48:1-55:15.) Since unsatisfactory performance requires automatic performance probation for up to 90 days, when Ponce returned to work from FMLA leave in December 2015, he was immediately placed on 90-days probation. (Doc. #39-4, 25:6-12.)

During the probationary period, Ponce was not assigned to the dumpster carrier driving position. Instead, the City briefly assigned him to work on a recycling truck, after which he was assigned to drive a large 40-yard roll-off dumpster carrier, which plaintiff testified he had no experience nor adequate training to operate.[4] (Doc. #39-1, 26:21-27:5.)

---

[3] Kotala and Middleton did not participate at all in the completion of the evaluation. (Doc. #39-3, 44:5-12; Doc. #39-4, 29:5-11.)

[4] The City disputes this as Wilcox testified that Ponce has operated a roll-off truck many times throughout the years. (Doc. #39-2, 112:6-25.)

### 3. Three Instances of Misconduct on January 19, 2016

On January 19, 2016, Wilcox submitted a memorandum to Kotala, describing three instances of insubordination/neglect by Ponce that had occurred that day.[5] (Doc. #44-21.) The parties' version of events as to what transpired vary; therefore, the following is a summation of the three instances but is not necessarily accepted as undisputed evidence.

First, on January 19, 2016, Ponce left his truck unattended and idling in the yard, which was a violation of the City's policy against letting trucks idle for no more than three minutes. Kotala asked Ponce why he left the vehicle running and Ponce stated that the vehicle was performing a "burn off,"[6] but Ponce had failed to inform his supervisor that he was doing so, in violation of City policy.[7] (Doc. #39-3, 59:17-60:21.) Kotala told Ponce that he needed to tell his supervisor when he changes assignment areas

---

[5] Wilcox testified that Kotala told him to prepare the memo. (Doc. #39-2, 101:1-14.)

[6] Ponce explained that diesel trucks need to burn off carbon and be regenerated, which is what a light indicated on the truck that day. (Doc. #39-1, 31:3-15.) If a burn off is not done, the vehicle will shut down. (Doc. #39-2, 109:20-22.)

[7] The parties dispute whether this was City policy. Kotala testified that this was the City's policy but did not know if the policy was in writing. (Doc. #39-3, 60:4-5.) Wilcox was not sure if this was a policy or not, but knows it is the "rule." (Doc. #39-2, 106:6-24.) Plaintiff submitted the Declaration of Giovanni Fajes, a Service Worker in the Division, who states that there was never a policy to notify a supervisor before performing a regeneration or burn off. (Doc. #44-22, ¶ 10.)

and that they could talk about it on Friday, to which Ponce replied "You can talk all you want." (Id., p. 1.) Ponce testified that when he was performing the burn off Kotala approached him about the idle policy, and Ponce said he was aware of the policy but in his defense, he was performing a burn off and stated "you could talk about it all you want, but on my defense you have to let the truck run for 15, 20 minutes." (Doc. #39-1, 31:16-32:5.) Wilcox's testimony regarding this incident was that Ponce's response was "normal conversation" and something that Ponce would normally say as Ponce felt that what he had done was right. (Doc. #39-2, 109:1-6.)

Second, later that morning, Ponce called Wilcox to inform him that he was unable to load a container onto a roll-off truck after three attempts. Wilcox's memorandum states that Ponce said: "'You and Denny can just do whatever you have to do' as he refused to complete the task." (Doc. #44-21.) The memo states that Ponce failed to perform his assigned task without assistance. (Id.) Ponce denies that he said this to Wilcox, instead he testified that he told Wilcox to "come and tell me what to do." (Doc. #39-1, 30:12-20.) Ponce ultimately completed the task with the help of Solid Waste Coordinator Gary Julian. The City believes that Ponce should have known how to load the container by himself. (Doc. #39-2, 114:10-14.)

Third, later that day, Wilcox assigned Ponce to load a 40-yard container onto a roll-off truck and move it out of the entrance of the tipping floor. (Doc. #44-21.) Ponce replied, "already done" over the radio, but Wilcox saw that it had not been done as the container was still at the entrance. Ponce testified that when he said "already done" he assumed that Wilcox was referring to the truck blocking the entrance, which Ponce had already moved. (Doc. #39-1, 36:15-23.) The container was still on the floor though, which was what Wilcox was referring to.

On January 28, 2016, plaintiff was placed on a 3-day unpaid suspension because of the three incidents. (Doc. #44-21.) The Notice of Disciplinary Action states that Ponce became argumentative and was insubordinate to his supervisor in the pre-disciplinary hearing. (Id.)

### 4. Roll-Off Truck Incident on January 25, 2016

Further, Julian and Wilcox submitted separate memorandums to Kotala describing an incident that occurred with Ponce on January 25, 2016. (Doc. #44-23.) On this date, Ponce drove a roll-off truck to the Fort Myers recycling facility carrying a load. Once there, he was unable to open the rear door because one of the three latches was wedged. (Doc. #39-1, 39:20-40:13.) After Ponce sought assistance, one of the employees at the facility attempted to use a forklift to dislodge the door, but could not get it open. (Id., 40:20-22.) Ponce advised Wilcox and was instructed to

return the truck back to the Naples facility.  Ponce was unable to get all three latches secured, so he secured it with a chain in case it would open and drove the full load back to Naples with only two of the three latches closed and in the locked position. (Id., 41:7-20.)

Wilcox's memorandum states that Ponce drove back with a full load from Naples without the rear door properly and safely latched. Wilcox also stated that prior to going to Fort Myers, Ponce had not performed a proper walk-around inspection of the container door or latch, and as a result, Ponce was reckless in his job duties.  (Doc. #44-23, p. 1.)  Ponce testified that there was no way the door was going to open given that even a forklift could not cause it to open, which he explained to Middleton and Kotala at his hearing after the incident.  (Doc. #39-1, 46:7-24.) Plaintiff also submitted the Declaration of Giovanni Fajes, another employee of the Division (Doc. #44-2), who states that Wilcox and Julian hit the latch with a sledgehammer to try to open it once Ponce returned and when that didn't work[8], the door was opened with front end loader bucket.

**B. Ponce Resigns**

In early February 2016, the City advised Ponce that his employment was being terminated.  The Notice of Disciplinary

---

[8] This is in dispute.  Kotala testified that the door was opened with a sledgehammer.  (Doc. #39-2, 77:1-78:5.)

Action states that this was due to gross neglect of safety policy in failing to secure the roll-off container and failure to notify a supervisor of the serious safety issue. (Doc. #44-23.) The Notice also states: "A review of employee's work performance indicates continual neglect of duty and safety violations. Employee's performance remains unsatisfactory." (Id.) Ponce was told that he could resign in lieu of termination, which he did. The City's Human Resources Director signed off on the termination because: "[Ponce] was on performance probation. He had had several incidents during the probationary period, and the egregiousness of that final act, that could have been a horrible accident on I-75." (Doc. #39-5, 99:13-22.)

### III.

#### A. FMLA Retaliation (Count 7)

To prevail on a FMLA retaliation claim, "an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." Strickland v. Water Works and Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1207 (11th Cir. 2001). Absent direct evidence of an employer's intent, "an employee claiming FMLA retaliation must show that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." Martin v. Brevard Cnty. Pub. Sch., 543

F.3d 1261, 1268 (11th Cir. 2008).  The Eleventh Circuit has held that the burden shifting McDonnell-Douglas framework[9] applies to FMLA retaliation claims based upon circumstantial evidence. Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006).

Here, neither party disputes the first two prongs; the only dispute is whether the undisputed material facts constitute a sufficient causal link between Ponce taking FMLA leave and his termination, and the City argues that it can establish legitimate, non-retaliatory reasons for plaintiff's termination.

### 1. Causal Relationship Between Protected Conduct and an Adverse Employment Action

The third element, a causal relationship, requires an employee to demonstrate that the decision-maker was aware of his protected conduct and that the protected conduct and the adverse action were not wholly unrelated.  McCann v. Tillman, 526 F.3d 1370, 1376 (11th Cir. 2008).  "For purposes of a prima facie case, close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated."  Freytes-Torres v. City of Sanford, 270 F. App'x 885, 893 (11th Cir. 2008) (citation omitted).  Causation may be inferred by close temporal proximity between the protected conduct and the materially adverse action taken by the employer.  Thomas

---

[9] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). "We have held, however, that in the absence of other evidence tending to show causation, a three-to-four month time gap between the protected conduct and the adverse employment action is insufficient to establish causation on its own." Walker v. Sec'y, U.S. Dept. of Air Force, 518 F. App'x 626, 628 (11th Cir. 2013) (citing Thomas, 506 F.3d at 1364); Brown v. Ala. Dept. of Transp., 597 F.3d 1160, 1182 (11th Cir. 2010) (holding that a three month timespan between the protected activity and the adverse action was too long). "Thus, in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." Id. See also Vira v. Crowley Liner Services, Inc., --- F. App'x ---, 2018 WL 674303, *3 (11th Cir. Feb. 2, 2018) ("While a few days is sufficient for a causal connection, a few months is not.").

Here, plaintiff was informed approximately one month after he returned from FMLA leave that he would be terminated. Moreover, there is other evidence in the record tending to show causation. The day plaintiff returned from FMLA leave he was placed on a 90-day probation as a result of the first overall unsatisfactory performance evaluation he had received in 26 years, drafted while he was on FMLA leave. There is sufficient evidence of a temporal proximity between plaintiff's FMLA leave and his termination.

### 2. Legitimate, Non-Retaliatory Reason

If plaintiff establishes a prima facie case, the employer must then respond with a legitimate, non-retaliatory reason for its actions. Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1308 (11th Cir. 2012). The City argues it has a legitimate and non-retaliatory reason for placing Ponce on a 90-day probation, a 3-day suspension, and then terminating him, namely the evidence of an unsatisfactory performance review, and misconduct and insubordination while on probation. The City states that the "last straw" for the City was Ponce's failure to secure the door of a loaded roll-off truck, causing a major safety hazard.

As detailed above, the parties diverge on their version of events on January 19 and 25, 2016, which led to plaintiff's termination, placing the issue of whether Ponce was insubordinate in dispute. There is also evidence in the record to show that Ponce's behavior on January 19, 2016 was not out of character for him and was the result of a misunderstanding, such that in the past the City would not have punished him for similar behavior. Indeed, Kotala testified that he does not have a problem with Ponce asking for help when he is unable to perform a task, and he doesn't know whether doing so is a policy violation (Doc. #39-3, 65:2-5, 66:10-12), although this was one of the reasons plaintiff was placed on placed on a 3-day suspension. There is also a dispute whether allowing the truck to idle and perform a burn off violated

the City's policy or was out of the ordinary. Plaintiff has also offered evidence of other safety incidents by employees that are arguably as egregious as Ponce's actions that did not result in termination. For example, Jerrold Epps began backing up a piece of heavy equipment without warning his flagman, hitting a vehicle. He did so while driving on a suspended license without notifying the City and had ten preventable accidents within the last 5 years. (Doc. #44-26.)

Further, the City has produced no evidence to support its assertions that Ponce was not performing his job satisfactorily when they placed him on a 90-day probation, and this is coupled with the fact that Ponce received his first overall unsatisfactory evaluation immediately following his return from FMLA leave. No City official could testify as to specific instances of misconduct by Ponce that would lead to such a negative evaluation, and during that evaluation period White had praised Ponce and recommended him for a promotion. Taking the evidence in the light most favorable to Ponce, he is entitled to proceed to trial on this claim. Therefore, defendant's motion for summary judgment as to his FMLA retaliation claim is denied.[10]

---

[10] Because the Court finds that there is a genuine issue of material fact whether the City has articulated a legitimate, non-retaliatory reason for terminated plaintiff, the Court need not address whether plaintiff has established that the reason is a pretext to mask unlawful retaliation.

## B. ADA Disability Discrimination (Count 9)[11]

Under the Americans with Disabilities Act, 42 U.S.C. §
12112(a), it is unlawful for an employer to "discriminate against
a qualified individual on the basis of disability in regard to ...
discharge of employees, ... and other terms, conditions, and
privileges of employment."  The ADA "imposes upon employers the
duty to provide reasonable accommodations for known disabilities
unless doing so would result in undue hardship to the employer."
Davis v. Florida Power & Light Co., 205 F.3d 1301, 1305 (11th Cir.
2000), cert. denied, 531 U.S. 927 (2000).

The Eleventh Circuit has recognized that ADA claims are to be
construed by the framework set out in McDonnell Douglas.  Lubetsky
v. Applied Card Sys., Inc., 296 F.3d 1301, 1305 (11th Cir. 2002).
Under this framework, plaintiff bears the initial burden of
establishing a prima facie case of discrimination.  McDonnell
Douglas, 411 U.S. at 802; Lubetsky, 296 F.3d at 1305.  To establish
a prima facie case for discrimination under the ADA, plaintiff
must produce sufficient evidence to permit a jury to find that he:
(1) is disabled, (2) was a qualified individual at the relevant

_____

[11] Plaintiff is not entirely clear on what timeframe the City
discriminated against him based upon his disability, but the
evidence shows that plaintiff was placed on light duty from
approximately May 2015 until he went on FMLA leave in August 2015.
When he returned to work from FMLA leave in December 2015, it was
without restriction (Doc. #44-33).  Therefore, the City would only
have had to provide a reasonable accommodation for plaintiff's
work restrictions from May to August of 2015.

time, and (3) was discriminated against because of his disability.
Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1268 (11th
Cir. 2014) (citing Holly v. Clairson Indus., L.L.C., 492 F.3d 1247,
1255-56 (11th Cir. 2007)).  The City disputes all three prongs.

### 1. Whether Plaintiff is Disabled

"The ADA defines the term 'disability' as (1) a physical or
mental impairment that 'substantially limits one or more' of an
individual's 'major life activities,' (2) a 'record of such an
impairment,' or (3) 'being regarded as having such an impairment'
as described in subsection (1)."  Mazzeo, 746 F.3d at 1268 (quoting
42 U.S.C. § 12102(1)).  An individual who is "actually disabled"
is one with "a physical or mental impairment that substantially
limits one or more major life activities."  42 U.S.C. §
12102(1)(A).  Major life activities "include, but are not limited
to, caring for oneself, performing manual tasks, seeing, hearing,
eating, sleeping, walking, standing, lifting, bending, speaking,
breathing, learning, reading, concentrating, thinking,
communicating, and working."  Id. § 12102(2)(A).

The City disputes that plaintiff was actually disabled under
the ADA.  Ponce responds that at a minimum the City "regarded him"
as disabled.  The Court finds that Ponce has produced sufficient
evidence to permit a fact finder to conclude that his heart and
shoulder conditions constitute physical impairments, and the
evidence is sufficient for the Court to conclude that the

impairments substantially limited a major life activity. Moreover, the Court also finds that Ponce is disabled under the "regarded as" definition of the ADA. The ADA provides that an individual is "regarded as" disabled if he "establishes that ... []he has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Thus, "a plaintiff need demonstrate only that the employer regarded him as being impaired, not that the employer believed the impairment prevented the plaintiff from performing a major life activity." Wolfe v. Postmaster Gen., 488 F. App'x 465, 468 (11th Cir. 2012).

Here, there is sufficient evidence to raise a genuine issue of material fact as to whether the City regarded Ponce as disabled by his heart and shoulder conditions. The City knew Ponce had had a heart attack and witnessed him suffer two heat strokes. Ponce also injured his shoulder while on the job and was placed on light duty, limiting his ability to work because of his impairment and the City sent Ponce notifications that he must be cleared by his doctor to work without restriction before he could return. Thus, there is evidence in the record that could allow a reasonable jury to infer at least that the City regarded plaintiff as disabled.

## 2. Whether Plaintiff is a Qualified Individual

The ADA prohibits discrimination in regards to the terms, conditions, and privileges of employment against "a qualified individual with a disability because of the disability of such individual...." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000).

Determination of whether plaintiff is an individual "qualified" for a job is a two-step process: First, does he satisfy the prerequisites for the position? Second, can he perform the essential functions of his job either with or without reasonable accommodation? Reed v. Heil Co., 206 F.3d 1055, 1062 (11th Cir. 2000); Cramer v. Florida, 117 F.3d 1258, 1264 (11th Cir. 1997). If plaintiff is unable to perform an essential function of his job, even with an accommodation, he is not a qualified individual. Davis, 205 F.3d at 1305. "Moreover, an employer's duty to provide reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." Frazier-White v. Gee, 818 F.3d 1249, 1256 (11th Cir. 2016) (quoting Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363-64 (11th Cir. 1999)).

Consideration must be given to the employer's judgment as to what functions of a job are essential and the employer's written description for that job. See 42 U.S.C. § 12111(8). Other factors to consider include: (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the incumbent to perform the function, (3) the terms of the collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the current work experience of incumbents in similar jobs. See 29 C.F.R. § 1630.2(n)(3); Davis, 205 F.3d at 1305; see also Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1526 (11th Cir. 1997).

Here, the City argues that driving a truck, picking weeds, and sweeping are all essential functions of his job that Ponce was unable to perform, even with an accommodation of light duty. Ponce responds that picking weeds and clipping hedges were not essential job functions because after his injury was the only time he ever performed such jobs. Ponce also states that even with the 10-15 pound light duty restriction imposed by his doctor, he was at all times able to perform the essential functions of his regular job of driving the dumpster carrier vehicle, but that the City chose to not place him in the position. The City responds that Ponce never requested a reasonable accommodation that was refused by the City (Doc. #39-1, 53:101-14; 55:11-19), but Ponce believes that

his doctor's recommendation that he be restricted to light duty was an accommodation request.

The summary judgment evidence includes plaintiff's job description for Heavy Equipment Operator. (Doc. #39-1, pp. 77-79.) See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1258 (11th Cir. 2001) (noting that consideration should be given to the employer's judgment and if an employer has prepared a written job description, it will be considered evidenced of the essential functions of the job). The job description states that the operator must be able to perform heavy labor, including routine servicing, cleaning, and maintenance on the vehicle, equipment, and machinery. (Id.) Plaintiff asserts that although he was classified as a Heavy Equipment Operator at the time of his injury, he was in fact driving a smaller dumpster carrier truck at the time and was not performing the functions as set forth in the job description; therefore, the Court should only consider the tasks that are required to drive the smaller truck in determining whether he could perform the essential functions of his job.[12]

The Court finds that there is a genuine issue of material fact as to whether plaintiff was a qualified individual.

---

[12] Plaintiff is not entirely clear as to what the essential functions of driving the smaller truck were, other than the requirement to operate hydraulic levers. Wilcox testified that he could see no reason why plaintiff could not operate the levers on the dumpster carrier truck with the light duty work restrictions. (Doc. #39-2, 76:2-77:8.)

Specifically, the parties dispute what job plaintiff was performing at the time that he was disabled and therefore dispute whether he satisfied the prerequisites to perform the essential functions of his job. The parties also dispute what the essential functions of his job were as the City asserts that outdoor yard work was an essential function while plaintiff asserts the contrary. The parties further dispute whether plaintiff could perform the essential functions with a reasonable accommodation and further dispute whether plaintiff even requested a reasonable accommodation.

### 3. Whether Plaintiff Was Discriminated Against Because of His Disability

Ponce alleges that he was discriminated against because of his disability by being placed on probation, suspension, and then termination, and there is enough evidence from which a reasonable jury could conclude that Ponce was discriminated against after he became disabled. Ponce argues that prior to his health problems he never received an overall unsatisfactory evaluation and did not have to perform outdoor yard work.

The Court agrees that there is a fact issue as to whether the City's actions taken against Ponce were because of his disability and not because of poor performance. Therefore, defendant's motion for summary judgment as to the ADA disability claim is denied.

## C. ADA Retaliation (Count 10)

The ADA prohibits retaliation "against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). This prohibition is analyzed "under the same framework ... employ[ed] for retaliation claims arising under Title VII." Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997). Accordingly, "[t]o establish a prima facie case of retaliation, a plaintiff must show: (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action." Id. The City challenges the first and third prongs.

### 1. Statutorily Protected Expression

Plaintiff claims that he engaged in statutorily protected expression when he requested a reasonable accommodation in the form of light duty and was retaliated against as a result of this request when the City refused to return him to his position operating a dumpster carrier. (Doc. #22, ¶ 128.) The City responds that Ponce did not request a reasonable accommodation to be placed back operating the dumpster carrier and in any event such a request was not reasonable because he could not perform the essential functions of the job. Again, as discussed above, the Court finds that this is in dispute.

## 2. Causal Relationship

"A plaintiff satisfies this element if he provides sufficient evidence" of knowledge of the protected expression and "that there was a close temporal proximity between this awareness and the adverse ... action."  <u>Shotz</u>, 344 F.3d at 1180 n. 3 (quoting <u>Farley v. Nationwide Mut. Ins. Co.</u>, 197 F.3d 1322, 1337 (11th Cir. 1999)). As discussed above with regard to the FMLA retaliation claim, causation in dispute.

Because there remains a genuine issue of material fact as to whether the City retaliated against plaintiff because of his disability, summary judgment is denied as to Count 10.[13]

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

Defendant's Motion for Summary Judgment (Doc. #39) is **DENIED.**

**DONE and ORDERED** at Fort Myers, Florida, this  _20th_  day of March, 2018.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record

---

[13] The FCRA is construed in conformity with the ADA.  <u>Albra v. Advan, Inc.</u>, 490 F.3d 826, 835 (11th Cir. 2007).  Accordingly, analysis of plaintiff's FCRA disability discrimination and retaliation claims (Counts 2, 3) is identical to analysis of the ADA claims, and summary judgment is accordingly denied as to the FCRA claims.